For the reasons stated above, the plaintiffs' motion for new trial is denied.

**ST. LOUIS FIRE AND MARINE INSURANCE COMPANY, a corporation, Plaintiff,**

v.

**AETNA INSURANCE COMPANY, a corporation, and Bernard E. Abbott, Defendants.**

No. 924.

United States District Court
S. D. West Virginia,
Bluefield Division.
April 5, 1968.

Edward W. Eardley, Steptoe & Johnson, Charleston, W. Va., for plaintiff.

Joseph M. Sanders, Sanders & Sanders, Bluefield, W. Va., for defendants.

CHRISTIE, District Judge:

In this declaratory judgment action, 28 U.S.C.A. §§ 2201 and 2202, two insurance companies contest their correlative obligations in connection with a loss for which a court has found their respective insureds jointly liable. Jurisdiction is founded upon diversity and requisite amount. The accident giving rise to liability occurred on October 27, 1962, in Mercer County, West Virginia, between a Volkswagen automobile owned and oper-

ated by Harold L. Davis and a 1959 International tractor ostensibly operated by William D. Buie Truck Line under a certificate of public convenience and necessity issued by the Interstate Commerce Commission. At the time of the collision the International tractor was owned by Southern Leasing, Inc., and permanently leased to Refrigerated Transport Co., Inc. The driver of the truck was furnished to Refrigerated Transport by Southern Leasing, and he was compensated for his driving by Southern Leasing. St. Louis Fire and Marine Insurance Company (hereinafter referred to as "St. Louis") was the insurer of William D. Buie Truck Line and Aetna Insurance Company (hereinafter referred to as "Aetna") was the insurer of Refrigerated Transport Co. on the date of the accident.

The somewhat complex relationship existing between Buie and Refrigerated at the time of the accident stems from an "Interchange of Equipment Agreement" entered into between these two companies for the purpose of facilitating the delivery of goods within areas served by them. Interstate carriers of what is known as regulated or non-exempt commodities must obtain from the Interstate Commerce Commission certificates permitting them to haul such commodities. Such certificates normally provide that a given motor carrier may transport commodities over a specific geographical area. Generally, Refrigerated Transport had "rights" to transport commodities from Florida as far north as Dillon, South Carolina, and Buie had a certificate which permitted it to transport commodities from Dillon, South Carolina at least as far north as Boston, Massachusetts. The obvious deficiencies in this arrangement, which could preclude delivery by an originating carrier of commodities destined for points beyond the coverage of its certificate, led the I.C.C. to promulgate regulations providing for the interchange of equipment between common carriers in connection with a "through movement of traffic."[1] In order to facilitate the movement of commodities from points north of Dillon, South Carolina to points south thereof and from points south of Dillon, South Carolina to points north thereof, Refrigerated Transport and Buie Truck Lines entered into an agreement which provided for what has been termed an "interchange of equipment."[2] This agreement provides as follows:

"This agreement between W. D. Buie Truck Line of Dillon, South Carolina, and Refrigerated Transport Co., Inc., of Atlanta, Georgia, is entered into for the purpose of complying with an order issued by the Interstate Commerce Commission dated November 23, 1956,

1. By Order, Ex Parte No. MC–43, Lease and Interchange of Vehicles by Motor Carriers, the Interstate Commerce Commission announced the following regulations pertinent to the resolution of the issues in this case:

"Sec. 207.5. *INTERCHANGE OF EQUIPMENT.* Authorized common carriers may by contract, lease, or other arrangement, interchange any equipment * * * with one or more other such common carriers, or one of such carriers may receive from another such carrier, any of such equipment, in connection with any through movement of traffic, under the following conditions:

"(a) *Interchange agreement to be specific.* The contract, lease, or other arrangement providing for interchange shall specifically describe the equipment to be interchanged;. the specific points of interchange; the use to be made of the equipment, and the consideration for such use * * *.

"(b) *Operating authority of carriers participating in interchange.* The certificates of public convenience and necessity held by the carriers participating in the interchange arrangement must authorize the transportation of the commodities proposed to be transported in the through movement and service from and to the point where the physical interchange occurs."

2. Section 217.2(c) of Ex Parte No. MC–43 defines "interchange of equipment" as "the physical exchange of equipment between motor common carriers or the receipt by one such carrier of equipment from another such carrier, in furtherance of a through movement of traffic, at a point or points which such carriers are authorized to serve."

in Docket Ex Parte No. MC 43 covering the leasing and interchanging of vehicles by authorized carriers.

"It is the expressed desire of the parties hereto to comply with and abide by the requirements of the said order and to that end they hereby agree each with the other as follows:

"(1) To interchange between themselves such equipment as is described in Appendices A and B. If either party acquires equipment from any source through purchase, lease or under interchange and which is not shown in Appendices A and B, such carrier shall be considered the owner for the purpose of this agreement.

"(2) All equipment so interchanged shall be used in connection with the movement of through traffic covered by a bill of lading issued by the originating carrier. The interchange agreement shall apply on equipment moving from Dillon, South Carolina, to final destination and return to Dillon, South Carolina.

"(3) Regular interchange points under this agreement shall be at Dillon, South Carolina, however, other junctions may be used in emergencies provided the necessary arrangements therefor are made as required by the Interstate Commerce Commission.

"(4) The owner of vehicles interchanged hereunder shall be compensated therefor at the rate of 75% of the gross revenue allowable to the using carrier. The division of the total freight charges applicable to the through movement shall be determined in accordance with formulas agreed to by the interested carriers.

"(5) Each participating carrier shall furnish the other with proper insurance coverage under the requirements of the ICC and/or those various regulatory bodies involved."

Pursuant to this agreement, if Refrigerated Transport had a shipment of regulated or non-exempt commodities destined for points north of Dillon, South Carolina, bills of lading were cut in Florida showing Refrigerated Transport as the carrier and also showing the names of the consignor and consignee, and specifying the cargo. The tractor-trailer would then proceed, under Refrigerated Transport's rights, to Dillon, South Carolina, where an interchange of equipment would take place. At Dillon new bills of lading would be cut by Buie's dispatcher, showing Buie as the carrier. Buie's men would then inspect the equipment and Buie's placards would be placed on each of the cab doors. Following this process, the driver would then proceed to the delivery points designated on the bills of lading, operating during this phase of the journey under the authority granted Buie by the Interstate Commerce Commission. Neither the tractor, trailer, nor driver was changed at Dillon, the only change being with respect to the operating rights under which the carrier traveled and the new bill of lading showing Buie as the carrier. Shipments originated north of Dillon by Buie Truck Lines followed the same interchange procedure when traveling south of Dillon under the authority granted Refrigerated Transport by the Interstate Commerce Commission.

It has been deemed necessary to go into some detail concerning the mechanics of the interchange agreement between Refrigerated and Buie in order that a clearer understanding may be had of the circumstances surrounding the accident in Mercer County, West Virginia on October 27, 1962, however, any resemblance between the operation contemplated by this agreement and the events leading up to the collision involving the Volkswagen must, in the light of the facts of this case, be considered purely coincidental. The tractor-trailer involved in this case began its journey in Florida, driven by James O. Boggs under a "spot" or "trip" lease to Florida Frozen Foods, and under the certificate or "rights" granted Florida Frozen Foods by the Interstate Commerce Commission. Boggs delivered the load of citrus juice to Niagara Falls, Canada, traveling the entire distance under the authority of Florida Frozen Foods without the necessity of

passing through the interchange in Dillon and under no obligation to resort to the use of Buie's I.C.C. certificate provided for under the Interchange Agreement. After delivering the juice at Niagara Falls, Boggs, "according to his usual custom and practice," called Bill Wolfe, Buie's dispatcher at Dillon, South Carolina, and was directed by Wolfe to call Ted Falls Trucking Company to arrange for a haul of frozen pies over the territory in which Ted Falls had "rights." After Boggs had delivered the frozen pies, he called Freddie Greenleaf, a commission agent responsible for soliciting freight for Buie Truck Lines, who directed Boggs to come to Boston. When Boggs arrived at Boston, he was directed by Greenleaf to pick up several shipments of beef, a regulated commodity, and seafood, an unregulated commodity. Boggs made the pickups as directed and upon returning to Buie's offices in Boston he was instructed by Greenleaf with respect to the places of delivery of the cargo. When told that some of the seafood on the truck was to be delivered in Princeton, West Virginia, Boggs advised Greenleaf that he would not take the load since under the interchange agreements he would have to go to Dillon, South Carolina, for the interchange of equipment and then return or backtrack to Princeton—a trip of between four and five hundred miles and one on which he would not have made any money. Greenleaf advised Boggs that if he would haul the load, permission could be obtained from Buie, at Dillon, for Boggs to "by-pass" the interchange point. Greenleaf then called Bill Wolfe, Buie's dispatcher in Dillon, and received permission for Boggs to by-pass Dillon. Thereafter Greenleaf cut bills of lading showing Buie as the carrier with the names of the various consignors and consignees and a description of the cargo, and placed Buie placards on the doors of the cab. Boggs left Boston traveling under Buie's I.C.C. rights, with Buie placards on the doors of the cab and with bills of lading showing Buie as the carrier. The trip from Boston to Princeton, West Virginia, was not authorized by the certificates of either Buie Truck Lines or Refrigerated Transport and was in violation of the rules and regulations of the Interstate Commerce Commission. It was while Boggs was attempting to deliver his cargo in Princeton, West Virginia, that the accident giving rise to liability in this case occurred.

From a review of the preceding facts two things become obvious. First, the purported interchange of equipment which occurred in Boston, Massachusetts, was not in accordance with either the I.C.C. regulations or the interchange agreement between Buie and Refrigerated. The I.C.C. regulations provide for an "interchange of equipment" at a point or points "which such carriers are authorized to serve." Clearly, these regulations contemplated an interchange of equipment at a point which, under their respective I.C.C. certificates, the carriers were authorized to serve. Since Refrigerated Transport's certificate did not permit it to serve the Boston area, no legitimate interchange was possible under the regulations in Boston. In spite of this fact, Boggs has testified that the procedure followed in this instance was "according to usual custom and practice" and we must assume with the consent of Refrigerated Transport. Secondly, the solicitation of cargo for, and direction to, Princeton, West Virginia, by Buie's agent in Boston was obviously not in accordance with the I.C.C. regulations or the "Interchange Agreement," both of which contemplated the transportation of commodities over routes the operating carrier was authorized to serve. Buie's agents were clearly cognizant of this violation of the terms of the regulations and the interchange agreement, but the acquiescence of Refrigerated Transport in this deviation was not established by the evidence.

## COVERAGE UNDER AETNA POLICY

Aetna, under its policy with Refrigerated Transport, insures Refrigerated against liability for personal injury or property damage arising out of the

"ownership, maintenance or use" of all vehicles "owned or operated by the insured." Among the endorsements of the Aetna policy was one entitled "Receipts-Basis—Truckmen" which provided coverage for "additional insureds" under the following circumstances:

"It is agreed that such insurance as is afforded by the policy for Bodily Injury Liability, for Property Damage Liability * * * applies with respect to all owned automobiles and hired automobiles, and the use, in the business of the named insured, of non-owned automobiles, subject to the following provisions:

"1. *Definition of Insured.* As respects such insurance, Insuring Agreement III, Definitions of Insured, is replaced by the following:

With respect to the insurance for Bodily Injury Liability and for Property Damage Liability the unqualified word "insured" includes the named insured and also includes any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission, and any executive officer of the named insured with respect to the use of a non-owned automobile. The insurance *with respect to any person or organization other than the named insured does not apply*:

"(a) except with respect to an employee of the named insured, to any person or organization, or to any agent or employee thereof, engaged in the business of transporting property by automobile for the named insured or for others, with respect to any automobile of the commercial type (1) unless the accident occurs while such automobile is being used exclusively in the business of the named insured and over a route the named insured is authorized to serve

by federal or public authority * * *." (Emphasis added).

An endorsement such as the one under consideration gives the "additional insured" the protection of liability insurance, for such a clause creates liability insurance in favor of the additional insured with the same effect as though that person's name had been specifically inserted in the policy. 12 Couch, Insurance, Section 45.293; Farm Bureau Mutual Automobile Ins. Co. v. Daniel, 104 F. 2d 477 (4th Cir. 1939). It seems clear, however, that under the conditions prescribed in this endorsement, Buie Truck Lines and its employees are not covered as "additional insureds" since at the time of the accident the tractor-trailer *was not* "being used exclusively in the business of the named insured and over a route the named insured is authorized to serve." Thus, with respect to this particular endorsement, Aetna's policy does not provide coverage for liability on the part of Buie Truck Lines, its agents or employees.

A second endorsement attached to the Aetna policy provided as follows:

"In consideration of the named insured reporting to this Company total Gross Receipts from such operations, it is agreed that the policy to which this endorsement is attached to is extended to cover the interest of:

William D. Buie d/b/a
William D. Buie Truck Line
P. O. Box 483
Dillon, South Carolina

on a primary basis, *only while equipment* owned or hired by Refrigerated Transport Co., Inc., and/or J. L. Lawhon d/b/a J. D. Lawhon Trucking Company, 290 University Ave., SW, Atlanta, Georgia, *is being operated by an employee of, exclusively about the business of, and under the direction and control of Refrigerated Transport Co., Inc.,* and/or J. L. Lawhon d/b/a J. L. Lawhon Trucking Company *over the franchise of William D. Buie d/b/a*

*William D. Buie Truck Line.* It is further agreed that this coverage is primary as to Refrigerated Transport Co., Inc., and/or J. L. Lawhon d/b/a J. L. Lawhon Trucking Company and William D. Buie d/b/a William D. Buie Truck Line." (Emphasis added).

It is obvious that when the accident occurred the equipment "owned or hired" by Refrigerated Transport was not being "operated * * * over the franchise of William D. Buie," and, in the light of the facts of the present case, it would also seem that at the time of the accident the tractor-trailer was being operated under the direction and control of Buie Truck Lines as opposed to the direction and control of Refrigerated Transport contemplated by the endorsement. Exclusions in an automobile liability policy restricting coverage to a specified geographical area or over a prescribed route, such as in the present case, are effective to bar liability with respect to events occurring beyond the point or area specified. Person v. Tyson, 215 N.C. 127, 1 S.E.2d 367 (1939); Farm Bureau Mutual Automobile Ins. Co. v. Daniel, supra; Ellis v. New Amsterdam Cas. Co., 169 Va. 620, 194 S.E. 687 (Va.1938). Aside from the question of deviation, the circumstances under which the tractor-trailer was directed to Princeton, West Virginia, clearly demonstrate that Refrigerated Transport's equipment was not, as contemplated in the endorsement, being operated "exclusively about the business of and under the direction and control of" Refrigerated. The endorsement making Buie a "primary insured" was intended to protect him against liability arising from the operation of Refrigerated Transport's trucks under the Buie certificate on a through movement of traffic. In such a situation the shipment is originated by Refrigerated and the destination of the tractor-trailer has been determined prior to the interchange of equipment at Dillon, South Carolina. Under such circumstances the conditions of the endorsement making Buie a "pri-

mary" insured are satisfied, however, where, as in the present case, the shipment is not only originated by Buie, but a route outside of the area permitted by the I.C.C. certificates is chosen by him, the letter as well as the intent of the endorsement is violated and liability insurance which might otherwise arise in favor of Buie as an additional insured under the Aetna policy is not applicable.

■ Counsel for the plaintiff has not pointed out any other provision in the Aetna policy which might extend coverage to Buie Truck Lines under the facts of this case, and this Court, after a review of the entire policy, has not been able to locate such a provision. It follows that while the Aetna policy covered Refrigerated's liability—a proposition which the defendants have not denied—the protection of this policy under the circumstances of the present case was not extended to cover any liability on the part of Buie Truck Lines. In view of this finding, the line of cases cited by plaintiff in his brief with respect to "excess" and "other" insurance clauses in the policies bears little relation to the question in controversy. This is because excess and other insurance clauses are applicable only where there is overlapping or double insurance and this occurs only where two or more policies insure the same party upon the same subject matter and assume the same risk. 8 Appleman, Insurance Law and Practice, Section 4911 (1962). As has been shown, the policies in the present case do not provide overlapping coverage since Aetna's policy with Refrigerated Transport does not extend liability insurance protection to Buie Truck Lines. It should be noted that we are not here called upon to decide the question of the liability of Refrigerated Transport and Buie Truck Lines to the individuals injured as a result of the accident. A Circuit Court in Mercer County has already found Buie and Refrigerated jointly liable to Harold L. Davis, one of those injured in the accident. The issue with

which this Court is concerned involves only the question of coverage of the policies insuring Refrigerated and Buie. As we have seen, Aetna's policy covers only the liability of Refrigerated and, under the circumstances of this case, does not extend liability insurance protection to Buie Truck Lines.

## COVERAGE UNDER ST. LOUIS POLICY

It need only be noted with respect to the coverage of St. Louis that it has conceded coverage of Buie's liability under its policy, however, its position is that its coverage is only excess over the limits of liability of the Aetna policy. As we have seen, Aetna did not extend coverage for any liability incurred by Buie, its coverage being limited to Refrigerated's liability. As a consequence, and since we have seen Buie was not covered by Aetna, St. Louis' position that its policy extended only excess coverage over Aetna's coverage of Buie falls of its own weight.

It is the Court's understanding from the stipulation of the parties and the briefs submitted that the litigation in the Circuit Court of Mercer County is to be taken by this Court as determinative of the joint liability of Buie and Refrigerated to the injured occupants of the Volkswagen, and proceeding on this premise this Court has found nothing in the policies or exhibits stipulated into the record to relieve either from the responsibility of answering to their respective insureds for that liability on a pro rata basis. Under the principle of collateral estoppel, the same result is reached with reference to the joint and pro rata liability of St. Louis and Aetna for the amount they jointly paid in compromise settlement of the claim of Bernard E. Abbott, the other occupant of the Volkswagen.

This finding and conclusion necessarily requires each insurance company to assume its own attorney's fee and expenses.